*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2015 UT 82**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

DEON L. CLOPTEN,
*Appellant.*

No. 20111020
Filed September 4, 2015

Third District, Salt Lake
The Honorable Randall N. Skanchy
No. 031903432

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen.,
Salt Lake City, for appellee

Samuel P. Newton, Kalispell, MT, for appellant

JUSTICE DURHAM authored the opinion of the Court in which
CHIEF JUSTICE DURRANT and JUSTICE PARRISH joined.

JUSTICE LEE filed a concurrence, in which JUDGE HARRIS joined.

Due to his retirement, JUSTICE NEHRING did not participate
herein; DISTRICT JUDGE RYAN M. HARRIS sat.

JUSTICE DENO G. HIMONAS became a member of the Court on
February 13, 2015, after oral argument in this matter
and accordingly, did not participate.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1    Deon Clopten was convicted of murdering Tony Fuailemaa after a concert in Salt Lake City. He now appeals his conviction, alleging five errors in the district court proceedings.

¶2     Two of these alleged errors relate to Mr. Clopten's principal theory at trial, namely that the murder was committed by his cousin Freddie White. First, Mr. Clopten asked to call Mr. White as a witness so that he would claim a Fifth Amendment privilege in front of the jury, but the trial court denied this request. Second, Mr. Clopten attempted to introduce testimony that Mr. White told fellow prison inmates that Mr. Clopten was not the murderer, but the trial court excluded this testimony as inadmissible hearsay. Mr. Clopten challenges both of these rulings on appeal.

¶3     The remaining three alleged errors relate to the eyewitness testimony that identified Mr. Clopten as Mr. Fuailemaa's killer. As we have recognized in a series of opinions beginning with *State v. Long*, 721 P.2d 483 (Utah 1986), the use of eyewitness testimony to identify perpetrators of crime presents a difficult constitutional problem. On the one hand, such testimony is often the only evidence available to establish a criminal's identity. On the other hand, as forensic science has demonstrated, eyewitness identifications are frequently wrong but nevertheless powerfully persuasive to juries. Accordingly, such identifications lead with unusual frequency to wrongful convictions—an uncomfortable prospect for a criminal justice system committed to letting ten felons escape before punishing a single innocent. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *358. We have now wrestled with this problem for nearly three decades, articulating a number of doctrines intended to reduce the likelihood of wrongful convictions based on unreliable eyewitness identification testimony.

¶4     Mr. Clopten argues that the trial court incorrectly applied three of these doctrines. First, he argues that under *State v. Ramirez*, 817 P.2d 774 (Utah 1991), the trial court should have excluded a number of the prosecution's eyewitnesses as unconstitutionally unreliable. Second, he argues that under *State v. Clopten* (*Clopten I*), 2009 UT 84, 223 P.3d 1103, the trial court should have excluded the testimony of a prosecution expert who disputed the defense's claims about eyewitness unreliability. The prosecution expert's testimony, Mr. Clopten argues, impermissibly contradicts *Clopten I*'s conclusions about forensic science. Third and finally, he argues that the trial court's instructions to the jury regarding eyewitness reliability were constitutionally insufficient under *Long*, 721 P.2d 483.

¶5    For reasons explained below, we reject all five of Mr. Clopten's assertions of error and affirm his conviction.

## BACKGROUND

¶6    On December 1, 2002, Tony Fuailemaa attended a concert in downtown Salt Lake City with his fiancée, Shannon Pantoja. Also present at the concert were Deon Clopten, his cousin Freddie White, and two of their friends.

¶7    Early in the evening, Mr. Fuailemaa pointed Mr. Clopten out to his fiancée, asking her if she knew the guy "in all red, the one all flamed up." When she answered that she did not, Mr. Fuailemaa told her his name, that Mr. Fuailemaa knew him, and that "he had a problem with some of the homeys." An undercover officer testified that he noticed tension between the groups, but no violence immediately ensued.

¶8    Both groups left the concert early; Ms. Pantoja testified that she and Mr. Fuailemaa wanted to beat the traffic. Outside the venue, she noticed Mr. Clopten's three friends attempting to hide on the street in front of them, and Mr. Fuailemaa told her that he anticipated a confrontation. Ms. Pantoja suggested that they return to the concert so as to avoid a fight, but Mr. Fuailemaa insisted he would not back down. Ms. Pantoja then noticed Mr. Clopten approaching Mr. Fuailemaa from behind with his arm extended, holding a pistol. He exclaimed "What's up now, homey?" and shot Mr. Fuailemaa in the back of the head.

¶9    Four undercover officers at the concert heard the shots and came running. Informed by Ms. Pantoja that the killer was the man "in all red," they chased Mr. Clopten and his friends to their vehicle. Mr. Clopten and his friends drove away at high speed, pursued by police, and threw the murder weapon out the window before they were caught.

¶10    It is undisputed that Mr. Fuailemaa's murderer was one of the four men in the vehicle, but proving that it was Mr. Clopten has now taken over a decade. Mr. Clopten was charged in 2003 and tried in 2005, but the court declared a mistrial. He was tried again and convicted in 2006, but we reversed the conviction because Mr. Clopten had not been allowed to present expert testimony about the reliability of eyewitness identifications. *Clopten I*, 2009 UT 84, ¶ 49, 223 P.3d 1103.

¶11    At Mr. Clopten's third trial in 2011, the state presented eyewitnesses who identified him as the shooter. Mr. Clopten

primarily attacked the state's case in two ways. First, he sought to exclude the state's evidence and to minimize its effect, calling an expert witness to testify about the unreliability of eyewitness identifications and asking the judge for jury instructions on the same subject. Second, he presented his own evidence that another man in the vehicle—Mr. Clopten's cousin Mr. White—actually committed the murder.

¶12    Mr. Clopten's strategy failed. The jury convicted him of murder, and he now challenges his conviction on appeal.

## ANALYSIS

### I.  THE TRIAL COURT CORECTLY DENIED MR. CLOPTEN'S REQUEST TO CALL A DEFENSE WITNESS FOR THE SOLE PURPOSE OF PLEADING THE FIFTH IN FRONT OF THE JURY

¶13    In support of his defense that Mr. White was the true perpetrator of Mr. Fuailemaa's murder, Mr. Clopten proposed to call Mr. White as a witness. But Mr. Clopten stipulated that Mr. White would not give any testimony because he would invoke his Fifth Amendment privilege when called to the stand. Mr. Clopten argued in the trial court that the jury should be allowed to observe Mr. White plead the Fifth on the witness stand, but the trial court denied this request. Mr. Clopten later requested a jury instruction informing the jury that Mr. White had invoked his Fifth Amendment privilege and stating that the jurors were "entitled to give whatever weight you deem appropriate and draw any inference you feel is warranted regarding White's invocation of his Fifth Amendment privilege." The trial court refused this instruction.

¶14    On appeal, Mr. Clopten has challenged only the trial court's refusal to require Mr. White to take the witness stand and invoke his Fifth Amendment privilege in the presence of the jury, thus allowing him to argue inferences favorable to the defense from that act. He has not challenged the trial court's refusal to instruct the jury about the inferences jurors could make from Mr. White's out-of-court invocation of the privilege. Thus this case does not reach the question of inferences, but only the question of whether it was proper for the court to preclude an in-court demonstration.

¶15    As to the trial court's determination to avoid what would have been purely a theatrical event—putting a witness on the stand merely to refuse to testify—we have no doubt that its decision was well within its power to manage the trial process. *See*

*State v. Parsons*, 781 P.2d 1275, 1282 (Utah 1989) ("The trial court, with its inherent powers as the authority in charge of the trial, has broad latitude to control and manage the proceedings and preserve the integrity of the trial process.") Therefore, it was proper to exclude the witness.

## II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT EXCLUDED HEARSAY TESTIMONY

### A. Statements Against Interest

¶16 Next, Mr. Clopten claims that the trial court erred when it excluded the hearsay testimony of two potential witnesses. Both of these proposed witnesses were inmates who spoke with Mr. White while he was in prison. At the time of these conversations, Mr. White feared that Polynesians in the prison system would harm his cousin, Mr. Clopten, because of their belief that Mr. Clopten killed Mr. Fuailemaa. The first prisoner claimed Mr. White told him, "Look, if you can just let your homies know it wasn't [Mr. Clopten], I was there and I can tell you for a fact it wasn't him." When the prisoner asked Mr. White if he killed Mr. Fuailemaa, Mr. White gave the prisoner a "look" and said, "It wasn't [Mr. Clopten]." The second prisoner asked Mr. White if Mr. Clopten shot Mr. Fuailemaa. Mr. White responded negatively. When the prisoner then asked Mr. White if he was the shooter, Mr. White said "I can't talk about that."

¶17 Mr. Clopten argued below that these two prisoners should have been allowed to tell the jury about Mr. White's hearsay statements because they were admissible as statements against interest. But the trial court excluded this testimony because it found that Mr. White's alleged statements were not sufficiently contrary to his self-interest to warrant the application of this exception to the hearsay rule. To reverse the trial court on this issue, we must conclude the trial court abused its discretion. *See State v. Workman*, 2005 UT 66, ¶ 10, 122 P.3d 639.

¶18 Mr. Clopten had to satisfy two requirements in order to qualify for the statement-against-interest exception to the hearsay rule. First, he had to show that the hearsay statement was an utterance that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to . . . criminal liability." UTAH R. EVID. 804(b)(3)(A). Second, because Mr. Clopten sought to introduce hearsay testimony in a criminal case under the theory that it tended to

expose the declarant to criminal liability, he also had to show that the statement was "supported by corroborating circumstances that clearly indicate its trustworthiness." *Id.* 804(b)(3)(B).

¶19   "In determining if a statement is one made against penal interest" under the first requirement, "we look to the circumstances under which the statement was given." *State v. Drawn*, 791 P.2d 890, 894 (Utah Ct. App. 1990). The statement need not be an outright confession to a crime in order to be sufficiently contrary to the declarant's penal interest to be admissible. The United States Supreme Court, for example, has theorized that statements such as "I hid the gun in Joe's apartment" may be sufficiently self-inculpatory where the declarant knows that it would help the police to find a murder weapon. *Williamson v. United States*, 512 U.S. 594, 603 (1994) (internal quotation marks omitted). The key inquiry is whether the statement has a sufficient tendency to expose the declarant to criminal liability that "a reasonable person in the declarant's position would have made [it] only if the person believed it to be true." UTAH R. EVID. 804(b)(3)(A); *see also State v. Sanders*, 496 P.2d 270, 273 (Utah 1972) (statements that subject the declarant to criminal punishment are admissible "because experience teaches that it is unlikely that [a person] would so declare unless it were true").

¶20   None of the hearsay statements allegedly made by Mr. White directly exposed him to criminal liability because he never said that he committed the murder. Mr. Clopten argues that Mr. White's statements that Mr. Clopten did not commit the murder are nonetheless contrary to Mr. White's penal interests. Four individuals were in the vehicle that sped away from the scene of the murder: Mr. Clopten, Mr. White, and two other associates. The murder weapon was thrown from this vehicle during the ensuing high-speed pursuit. Thus, Mr. White would have known that the police suspected that one of these four individuals murdered Mr. Fuailemaa. Under these circumstances, statements exculpating Mr. Clopten necessarily indicate that one of the other three occupants of the getaway vehicle was the shooter.[1]

---

[1] Mr. Clopten argues that Mr. White's statements are self-inculpatory because State witnesses testified that the shooter was dressed all in red and only Mr. Clopten and Mr. White wore solid red tops on the night of the murder. But there is no indication that

¶21    Although Mr. White's statements have at least *some* tendency to expose him to criminal liability, this does not necessarily mean that his statements have a *sufficient* tendency to expose him to punishment that a reasonable person would not utter them if they were not true. That is a question for the trial court. Moreover, there is another motive for Mr. White to say that Mr. Clopten did not commit the murder other than the truth of the statement. Mr. White was concerned that other prisoners would harm his cousin if they believed that Mr. Clopten committed the murder. Mr. White, therefore, wanted to spread the word that Mr. Clopten was innocent in order to protect his cousin. The trial court was entitled to weigh the tendency of Mr. White's statements to expose him to criminal liability against Mr. White's other motives for uttering the statements. *See Sanders*, 496 P.2d at 273 (the district court may consider "various possible motivations" for the declarant to make the hearsay statement that cut against the application of the statement-against-interest exception, including "concern for assisting the defendant"). Under the facts of this case, the trial court did not abuse its discretion when it determined that Mr. White's statements did not have a sufficient tendency to expose him to criminal punishment that "a reasonable person in the declarant's position would have made [the statements] only if the person believed [them] to be true." UTAH R. EVID. 804(b)(3)(A).

¶22    Because the trial court did not abuse its discretion when it found that the first requirement of the statement-against-interest exception was not met, we need not examine the second requirement—whether "corroborating circumstances" clearly indicate the trustworthiness of the hearsay statements. *See id.* 804(b)(3)(B).

*B. The Residual Hearsay Exception*

¶23    Mr. Clopten also argues that the trial court erred when it refused to admit the hearsay statements under the residual exception to the hearsay rule. The residual exception is a catchall provision that may be applied when a hearsay statement "is not specifically covered by a hearsay exception in Rule 803 or 804."

---

Mr. White knew that eyewitnesses would testify that the shooter wore red when Mr. White made the statements. The relevant inquiry is whether the declarant knew that a statement was inculpatory *at the time the statement was made*. Information unknown to the declarant at that time is irrelevant.

UTAH R. EVID. 807(a). Under this exception, a hearsay statement is admissible when

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

*Id.* This exception is "intended for use in those rare cases where, although the out-of-court statement does not fit into a recognized exception, its admission is justified by the inherent reliability of the statement and the need for its admission." *State v. Nelson*, 777 P.2d 479, 482 (Utah 1989).

¶24 We hold that the trial court did not abuse its discretion when it declined to admit Mr. White's hearsay statements under the residual exception. Mr. Clopten has not shown that the statements have "equivalent circumstantial guarantees of trustworthiness" that are different from other recognized exceptions to the hearsay rule.

¶25 Mr. Clopten first contends that Mr. White's statements exonerating Mr. Clopten are corroborated by extrinsic evidence that Mr. White was the true killer. Mr. Clopten cites, for example, evidence produced at trial that Mr. White had suggested to other individuals that he was guilty of the crime and that he wore a red top on the night of the murder, which would be consistent with eyewitness testimony that the shooter was dressed "in all red." But the trustworthiness requirement is not satisfied by extrinsic corroborating evidence. Instead, courts look to either the circumstances in which the hearsay statement was made or the content of the statement itself to determine whether the declarant would be unlikely to lie. *See, e.g.*, UTAH R. EVID. 804(b)(2) (hearsay statement made under the belief of imminent death admissible); *id.* 804(b)(3)(A) (hearsay statement that is contrary to declarant's self-interest may be admissible). In order to satisfy the "equivalent circumstantial guarantees of trustworthiness" element of the residual hearsay exception, *id.* 807(a)(1), "hearsay evidence . . . must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial," *State*

*v. Plant*, 461 N.W.2d 253, 265 (Neb. 1990) (internal quotation marks omitted); *see also Nelson*, 777 P.2d at 482 (residual exception applies where the hearsay statement's "admission is justified by *the inherent reliability of the statement*" (emphasis added)). Mr. Clopten's citations to evidence unrelated to the hearsay statements are simply not relevant to the trustworthiness requirement.

¶26 Mr. Clopten also argues that the statements have circumstantial guarantees of trustworthiness because the statements tended to subject Mr. White to potential harm from other inmates. Mr. White believed that other prisoners wanted to seek retribution against Mr. Fuailemaa's killer. Thus, Mr. Clopten contends that statements implicating Mr. White as the actual killer are trustworthy because he would not subject himself to the danger of prison violence had the statements not been true. But the problem with this argument is that Mr. White never said that he killed Mr. Fuailemaa. And any assertion that Mr. White's statements indirectly implicated himself as the killer could reasonably be rejected by the trial court for the same reasons that the statement-against-interest exception does not apply to the hearsay statements. *See supra* ¶ 21.

### C. Adoptive Admission

¶27 The state filed a motion in limine to prohibit the two prisoners from testifying about Mr. White's hearsay statements. The motion, of necessity, provided the content of the hearsay statements. Mr. Clopten claims that because the state repeated the hearsay statements it sought to exclude, the testimony is admissible as an adoptive admission. *See* UTAH R. EVID. 801(d)(2) (a statement is not hearsay if it "is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true").

¶28 This argument is without merit because it conflates the filing of a motion summarizing the hearsay statements with the endorsement of these statements. It is strange to suggest that merely by articulating hearsay statements as part of a motion in limine the state embraces the very statements it is trying to exclude. Without some manifestation of adoption of the statement or affirmation of the truthfulness of the statement, statements like those in the state's motion are not adoptive admissions.

*D. Constitutionality of the Hearsay Rule*

¶29    Finally, Mr. Clopten argues that if no exception to the hearsay rule applies to the statements, he nonetheless should have been permitted to introduce the hearsay statements into evidence because of his constitutional due process right to present evidence in his defense. In support of this contention, he quotes *State v. Harding*, where we stated that "the defendant's right to present *all competent evidence* in his defense is a right guaranteed by the due process clause of our State Constitution, Art. I, Sec. 7, as well as our Federal Constitution." 635 P.2d 33, 34 (Utah 1981) (emphasis added). But a criminal defendant does not have a due process right to present any evidence the defendant may desire. A defendant only has a right to introduce competent, admissible evidence. *See Evidence,* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "competent evidence" by cross-referencing the term "*admissible evidence*"). Because hearsay evidence is not competent evidence under Utah law, and because Mr. Clopten has not presented any support for the proposition that the hearsay rule is unconstitutional when applied to evidence proffered by a criminal defendant, we reject his constitutional claim.

## III. ADMISSION OF EYEWITNESS IDENTIFICATIONS

¶30    As we explained above, the prosecution had little difficulty proving that Mr. Fuailemaa was killed by one of the four men the police captured after the shooting. But to prove that Mr. Clopten committed the murder, rather than Mr. White as the defense argued, the state relied on the testimony of eyewitnesses. Because some of these eyewitnesses testified that they recognized Mr. Clopten as the killer, their testimony potentially implicates the doctrines we have articulated to protect the innocent from convictions based on unreliable eyewitness identifications.

¶31    The first such doctrine to which Mr. Clopten appeals is the *Ramirez* test, announced by *State v. Ramirez*, 817 P.2d 774 (Utah 1991), which, according to Mr. Clopten, governs the admission of eyewitness identification testimony under the Utah due process clause. Mr. Clopten argues that the trial court violated *Ramirez* by allowing two of the state's eyewitnesses—Shannon Pantoja and Melissa Valdez—to identify him as the killer. Because of the importance of these witnesses' identifications to the state's case, Mr. Clopten argues, his conviction must be reversed.

¶32    We reject Mr. Clopten's appeals to *Ramirez*, concluding that we can apply it neither to Ms. Valdez's testimony nor to

Ms. Pantoja's. First, as to Ms. Valdez, we conclude that the state did not actually present her identification of Mr. Clopten to the jury and that *Ramirez* therefore simply does not apply. Second, as to Ms. Pantoja, we conclude that we cannot review the trial court's decision to allow Ms. Pantoja to identify Mr. Clopten because Mr. Clopten has not adequately challenged that decision on appeal.

### A. The State Did Not Present Ms. Valdez's Identification of Mr. Clopten to the Jury

¶33　The state argues that *Ramirez* does not apply to Ms. Valdez because her testimony did not actually identify Mr. Clopten as the killer. Although the state was permitted by pretrial ruling both to have Ms. Valdez identify Mr. Clopten in court and to introduce evidence that she had picked Mr. Clopten out of a police photo lineup, it ultimately chose to do neither of these things. Instead, it questioned Ms. Valdez primarily about her memories of the night of the murder.

¶34　Mr. Clopten disputes the state's characterization of Ms. Valdez's testimony, suggesting three ways in which Ms. Valdez identified Mr. Clopten before the jury. First, Ms. Valdez identified Mr. Clopten's red sweatsuit as the clothing the killer wore. Second, her testimony corroborated the testimony of other eyewitnesses who did identify Mr. Clopten as the killer. And third, she testified that a defense investigator had presented her with a photo array, that she had recognized a person in the photo array as the killer, and that the defense investigator then told her that she "wasn't going to be any help to his case."

¶35　We can easily dismiss Mr. Clopten's first two arguments because *Ramirez* applies only to "eyewitness identifications." *Ramirez*, 817 P.2d at 779. This category includes in-court identifications and testimony about out-of-court identifications like police lineups and photo arrays, but it does not include, as Mr. Clopten seems to believe, all eyewitness testimony tying a defendant to a crime. *Ramirez* thus does not apply to witnesses who, like Ms. Valdez, testify merely about a perpetrator's appearance or apparel—his height, build, coloring, clothing, tattoos, and other qualities that might be shared by any number of people. It applies only when the state seeks to inform the jury that an eyewitness has recognized the defendant as the perpetrator.

¶36　Mr. Clopten's third argument is a closer call since the state did ask Ms. Valdez to testify that she had recognized the

killer in the defense's photo array. The question, then, is whether the state sought to inform the jury that the person Ms. Valdez had recognized was Mr. Clopten.

¶37    If we viewed the relevant testimony in isolation, we would likely conclude that was precisely the state's intent. Why else would the state have asked about Ms. Valdez's interview with the defense investigator? Yet the broader context ultimately persuades us that such a conclusion would be incorrect. At no point did the state present testimony that the person Ms. Valdez had identified was Mr. Clopten, or even that Mr. Clopten was among the people depicted in the defense investigator's photo array.[2] Neither did it admit the photo array into evidence, or even mention Ms. Valdez's testimony about the photo arrays in its first closing statement.

¶38    Instead, it was the defense that made sure the jury knew that Ms. Valdez had identified Mr. Clopten. It questioned her in detail about the various lineups she saw, admitted those lineups into evidence, and called a detective to testify about their flaws. Finally, during closing arguments, it was the defense that brought up Ms. Valdez's identification of Mr. Clopten, using the manifest weakness of the identification to support its argument for reasonable doubt.

¶39    This effort by the defense to tear down Ms. Valdez's identifications of Mr. Clopten—identifications the defense itself had presented to the jury—provoked the following rebuttal from the state:

---

[2] During the state's direct examination, Ms. Valdez testified only that she had recognized one of the defense investigator's photographs as the killer, and that the investigator had told her that she would not be helpful for his case. Although in hindsight it may seem obvious that this meant she had identified Mr. Clopten, it may not have been obvious at the time. From the state's questioning, the jury knew nothing about the lineup except that it had been shown to Ms. Valdez by a defense investigator, and the jurors may have imagined alternative explanations for the defense investigator's reaction. In particular, given the defense's theory that Mr. White was the killer, the jurors may have imagined that Mr. White, not Mr. Clopten, was depicted on the array, and that rather than successfully identifying Mr. Clopten, Ms. Valdez had failed to identify Mr. White.

[T]hese photo arrays here are a pointless distraction. Defense counsel is correct. Melissa Valdez didn't pick [Clopten] out of those lineups that were presented to her. Keep in mind, yes, she points to a guy to the defense investigator, but then when she is shown this [police photo array] she is unable to pick him out . . . .

Her testimony is not important because she picks somebody or doesn't pick somebody. Her testimony is critical, absolutely. But it's important because she corroborates [other eyewitnesses] and her description of what the shooter was wearing matches what the defendant was wearing.

¶40   We are persuaded that the state did not intend to present Ms. Valdez's identification of Mr. Clopten to the jury, and that if the defense had not used the weakness of Ms. Valdez's identification to bolster its own case, the jury would probably not have known that Ms. Valdez had identified Mr. Clopten. Though it is a close question, we therefore conclude that *Ramirez* does not apply.

### B. Mr. Clopten Has Not Adequately Challenged the Admission of Ms. Pantoja's Testimony

¶41   Ms. Pantoja, Mr. Fuailemaa's fiancée, was especially important to the prosecution's case because she was the closest observer of the murder and because she identified Mr. Clopten as the shooter less than an hour after the shooting. These factors, combined with her close personal connection to the victim, likely made her identification of Mr. Clopten very persuasive to the jury.

¶42   Accordingly, the defense asked Judge Skanchy, who presided over Mr. Clopten's third trial, to suppress Ms. Pantoja's testimony because it was insufficiently reliable under *Ramirez*. Judge Skanchy "decline[d]" to consider this argument, concluding that he "need not readdress whether Ms. Pantoja's identification of Mr. Clopten is sufficiently reliable" because Judge Fuchs, who presided over Mr. Clopten's second trial, had already decided that issue. To support this decision, Judge Skanchy cited the following paragraph from one of our cases:

A different branch of the law of the case doctrine—often called the mandate rule—dictates that a prior decision of a district court becomes mandatory after an appeal and remand. The mandate rule, unlike the

> law of the case before a remand, binds both the
> district court and the parties to honor the mandate
> of the appellate court. The mandate is also binding
> on the appellate court should the case return on
> appeal after remand.

*IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 28, 196 P.2d 588 (footnotes omitted). This rule, if it applied in this case, would presumably not only prohibit the trial court from reconsidering the reliability of Ms. Pantoja's testimony, but also prohibit us from considering Ms. Pantoja's reliability on appeal.

¶43　We decline to address the question of whether the mandate rule applies in this case because Mr. Clopten has not properly raised or briefed it. In all of Mr. Clopten's briefing, the trial court's decision not to reconsider Judge Fuchs's order is challenged only in a single footnote, reproduced here in its entirety:

> Judge Fuchs did not have the benefit of the
> multiple times Ms. Pantoja testified in this matter to
> highlight the numerous contradictions (including a
> subsequent trial) and the trial court should have
> revisited the issue given the new testimony.

This footnote neither acknowledges that the trial court invoked the mandate rule, nor argues that its invocation of that rule was in error, nor tells us whether any challenge to the trial court's use of the mandate rule has been preserved. *Cf.* UTAH R. APP. P. 24(a)(5)(A) (requiring appellants' briefs to include a "citation to the record showing that the issue was preserved in the trial court"). With some charity, we might read it as asserting that the mandate rule should not apply where new evidence has cast doubt on the earlier ruling, but it cites no authority for such an exception. *Cf. id.* 24(a)(9) (requiring "citations to the authorities . . . relied on"). And it certainly raises no argument that the mandate rule does not apply in a new trial. In short, it is entirely inadequate for contesting the trial court's decision.

¶44　Instead of contesting Judge Skanchy's decision not to determine Ms. Pantoja's reliability, Mr. Clopten has asked us to determine Ms. Pantoja's reliability ourselves. We cannot oblige. We cannot simply review Judge Fuchs's order, as Mr. Clopten apparently intends us to do: it was Judge Skanchy's order, not Judge Fuchs's order, that admitted Ms. Pantoja's testimony in the trial from which Mr. Clopten appeals. We also cannot review

Judge Skanchy's order as if he had independently decided that Ms. Pantoja's testimony is reliable under *Ramirez*: applying *Ramirez* involves factual determinations that are outside our purview as an appellate court, and Judge Skanchy made none of those determinations because he concluded that the mandate rule prevented him from applying *Ramirez*.

¶45   Our cases occasionally remark that we are not "'a depository in which the appealing party may dump the burden of argument and research.'" *Carlton v. Brown*, 2014 UT 6, ¶ 18, 323 P.3d 571 (quoting *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998)). Mr. Clopten did not intend to use us as one; his brief is lengthy and generally thorough. But where Ms. Pantoja's testimony is concerned, he has asked us to review a decision the trial court did not make, and he has failed to challenge the decision the trial court did make. We therefore decline to consider whether the trial court erred in allowing Ms. Pantoja to testify.

## IV.  THE STATE'S EXPERT TESTIMONY WAS ADMISSIBLE UNDER RULE 702 AND *CLOPTEN I*

¶46   At trial, Mr. Clopten took advantage of our decision in his first appeal and called an expert witness to testify about the various factors that might make eyewitness testimony unreliable. In response, the state called its own expert, Dr. John Yuille.

¶47   Dr. Yuille testified primarily that the laboratory studies on which the defense expert based his testimony have limited real-world applicability because of the differences between laboratory studies and actual crimes. Consequently, although many laboratory studies have shown that such factors as high stress and the presence of a weapon reduce the likelihood of accurate identifications—and although we have adopted these factors into our jurisprudence in *Long* and *Ramirez*—Dr. Yuille testified that the extent to which these factors actually influence eyewitnesses' ability to remember crimes is much less certain and much more complicated than the laboratory studies suggest.

¶48   Mr. Clopten now argues that Dr. Yuille's testimony was inadmissible under rule 702 of the Utah Rules of Evidence and our decision in *Clopten I.* Because the defense did not object below to the qualification of Dr. Yuille as an expert witness or to most of his testimony, Mr. Clopten acknowledges that this issue was not preserved. He argues that we may nevertheless consider it because admitting the testimony was plain error and because the defense's failure to object denied Mr. Clopten his constitutional

right to effective assistance of counsel. Both arguments fail because Dr. Yuille's testimony was admissible under rule 702 and *Clopten I*.

*A. Dr. Yuille's Testimony Was Admissible Under Rule 702*

¶49     Dr. John Yuille is an emeritus professor in the Department of Psychology at the University of British Columbia. He has specialized in eyewitness memory research for forty years, during which time he has published over a hundred scholarly works, including eight books and many dozens of peer-reviewed articles. In recognition of his work, he has been inducted as a fellow into the Canadian Psychological Association.

¶50     There is therefore no dispute that Dr. Yuille is a qualified expert under rule 702(a). The only question is whether his testimony is based on "principles or methods" that "(1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." UTAH R. EVID. 702(b). This condition is automatically deemed satisfied "if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community." UTAH R. EVID. 702(c). Mr. Clopten argues that Dr. Yuille's testimony did not meet the requirements of rule 702(b) because, as Dr. Yuille acknowledged, his conclusions differed from those of the majority of researchers.

¶51     Mr. Clopten's argument fails because rule 702(b)'s reliability requirement does not apply to expert witnesses' conclusions, but rather to the "principles and methods" underlying their conclusions. Certainly, if an expert's conclusions are universally rejected by other experts in the field, that may be strong evidence that her principles and methods are unsound, or at least not generally accepted. But rule 702 does not permit courts to exclude expert testimony because it represents a minority view or because the court disagrees with it. *See* UTAH R. EVID. 702, advisory comm. note ("Contrary and inconsistent opinions may simultaneously meet the threshold; it is for the factfinder to reconcile—or choose between—the different opinions."). It allows suppression only where the testimony lacks an adequate methodological basis.

¶52     In this case, nothing amiss has been identified in the methodological basis for Dr. Yuille's testimony. His criticism of the defense expert's conclusions was not mere speculation, as

Mr. Clopten has asserted on appeal. Rather, it was based on a thirty-year history of peer-reviewed field studies, many of them not conducted by Dr. Yuille, and on the generally accepted principle of psychological science that differences between laboratory studies and the real world sometimes limit the studies' external validity—that is, their ability to predict real-world behavior. That Dr. Yuille disagrees with the majority of researchers in his field about some laboratory studies' external validity does not prove that his conclusions lack an adequate methodological basis. It merely demonstrates that eyewitness memory science, like all science, is an unfinished project whose conclusions are subject to debate and revision as researchers publish more studies and methodologies improve.

### B. Dr. Yuille's Testimony Was Admissible Under Clopten I

¶53   The continued progress of science is among the chief reasons that expert testimony is superior to the *Long* instructions: expert witnesses will be aware of recent developments in the field and testify accordingly, while our *Long* factors are now almost thirty years old. *See State v. Long*, 721 P.2d 483 (Utah 1986). Even our lengthy discussion of eyewitness memory science in *Clopten I* is five years old, *see Clopten I*, 2009 UT 84, 223 P.3d 1103, and we expect that some of the scientific findings on which *Clopten I* relied have already been called into question by subsequent research. We would not have expected otherwise when *Clopten I* was decided.

¶54   Yet Mr. Clopten asks us to bind trial judges and experts like Dr. Yuille forever to our own assessment of the state of the science in 2009, arguing that "Yuille's claims directly violated this Court's clear precedent." This argument is a category error: precedent is a statement of law, not fact, so it is logically impossible for a witness's factual claims to "violate precedent."

¶55   It may violate precedent for a judge to allow a particular witness to testify, but nothing in *Clopten I* directs judges to accept only those expert witnesses whose understanding of eyewitness memory science agrees with the one we expressed five years ago based on the state of the science at that time. Indeed, it would have been legally problematic if the *Clopten I* court had required suppression of experts who disagreed with it—*Clopten I* interprets and applies rule 702, and, as explained above, rule 702 does not allow a court to suppress expert witnesses because it disagrees with their conclusions.

¶56    We therefore conclude that Dr. Yuille's testimony was properly admitted. Consequently, Mr. Clopten's trial counsel was not constitutionally ineffective for failing to object to it, and the trial court did not plainly err by failing to exclude it.

## V.  THE TRIAL COURT DID NOT ERR WHEN IT DECLINED TO GIVE ADDITIONAL PROPOSED INSTRUCTIONS ON EYEWITNESS TESTIMONY

¶57    Finally, Mr. Clopten argues that his conviction should be reversed because the trial court did not give certain instructions on eyewitness identification that he had requested. Even though Mr. Clopten and the State presented expert testimony on the reliability of eyewitness identifications, the trial court instructed the jury on the *Long* factors. The *Long* factors identify a number of considerations a jury may weigh in determining the reliability of an eyewitness identification, including whether the eyewitness had an adequate opportunity and capacity to observe a criminal actor and whether the eyewitness's memories are reliable. *State v. Long*, 721 P.2d 483, 494 n.8 (Utah 1986). In addition to these *Long* instructions, Mr. Clopten asked the trial court to give more detailed instructions regarding identifications where the eyewitness and the suspect are of different races and instructions regarding the degree of certainty expressed by the eyewitness.

¶58    The trial court refused to give these proposed instructions. On appeal, Mr. Clopten argues that the trial court erred. He asserts that the trial court improperly denied him "the ability to educate the jury about factors this Court expressly countenanced in *Clopten I*."¶59    In *State v. Long*, we directed trial courts to instruct the jury on eyewitness identifications whenever it "is a central issue in a case and such an instruction is requested by the defense." 721 P.2d at 492. Later, in *Clopten I*, we held that expert testimony "regarding factors that have been shown to contribute to inaccurate eyewitness identifications should be admitted whenever it meets the requirements of rule 702 of the Utah Rules of Evidence." 2009 UT 84, ¶ 30, 223 P.3d 1103. In order to reconcile the central holdings of *Long* and *Clopten I*, we further clarified that trial courts should still give a *Long* instruction where the defendant does not call an expert on eyewitness identifications. *Id.* ¶ 34. "Where eyewitness expert testimony is heard, however, *Long* no longer applies and the inclusion of a cautionary instruction, if requested, is a matter for the trial judge's discretion." *Id.*

¶60 Because Mr. Clopten presented extensive expert testimony designed to educate the jury on the factors relevant to the reliability of eyewitness identifications, the trial court had no obligation to present a *Long* instruction. The presentation of any instructions on this subject, including the supplemental eyewitness identification instructions created by Mr. Clopten, was discretionary. Given the extent of expert testimony on eyewitness identifications at trial, we see no reason to believe it was an abuse of discretion to decline to give the additional proposed instructions.

## CONCLUSION

¶61 We conclude that none of Mr. Clopten's assertions of error have merit. We therefore affirm his conviction.

––––––––––––

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶62   I concur in the judgment of the court and concur in its opinion in part. I write separately, however, because I disagree with the analysis in Part III of the majority opinion.

¶63   In Part III the majority holds that Clopten lacks standing to complain about the eyewitness identification testimony of Melissa Valdez because it was the defense, and not the prosecution, that presented Valdez's identification to the jury. *Supra* ¶ 38. In so concluding, the court sidesteps the question whether the due process standards articulated in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), are implicated in a case in which there is no state action in the form of suggestive police misconduct.

¶64   I see the matter differently. I see no basis for the decision to deem Clopten to have affirmatively advanced the eyewitness in question. Valdez was unquestionably a witness for the prosecution. And Clopten did not present her identification testimony to the jury for any of his own purposes; he only sought to undermine the credibility of her eyewitness identification on cross-examination. In deeming such cross-examination the equivalent of affirmative advancement of a witness's testimony, the court imposes a substantial (and unnecessary) burden on the exercise of the right of cross-examination. It also creates a Catch-22 for defense counsel—of either accepting the eyewitness as presented by the prosecution (while preserving the right to challenge that witness under *Ramirez*) or undermining that eyewitness on cross-examination (but waiving the right to assert a *Ramirez* claim).

¶65   The court's analysis on this point is both legally and practically troubling. Accordingly, I would reject Clopten's claim on a different ground. I would hold that the due process standard in *Ramirez* requires a threshold showing of police misconduct, and that Clopten's claim fails because there was nothing of that sort in this case.

I

¶66   The briefs filed on appeal argued at length over a threshold question concerning the applicability of the standards set forth in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), in a case like

this one. The question is whether the factors we identified in *Ramirez* apply in a case in which there is no allegation of suggestive police activity. In the State's view, such activity is required because *Ramirez* articulates standards for analyzing a constitutional due process claim, and police misconduct is necessary to establish the state action element of any such claim. Clopten staked out the contrary view. He asserted that *Ramirez* has been extended—and should be extended—to all cases where eyewitness identification testimony is in question. And he asked us to construe the Due Process Clause of the Utah Constitution to establish a standard of evidentiary reliability even absent police misconduct.

¶67 The majority avoids this question. It does so on the ground that that Clopten has no standing to complain about Valdez's testimony regarding the photo lineup because "it was the defense" (and not the State) who "made sure the jury knew that Ms. Valdez had identified Mr. Clopten." *Supra* ¶ 38. The court acknowledges that it was the State that first put Valdez on the witness stand—and elicited her testimony "that a defense investigator had presented her with a photo array, that she had recognized a person in the photo array as the killer, and that the defense investigator then told her that she 'wasn't going to be any help to his case.'" *Supra* ¶ 34. But it nonetheless concludes that the State somehow "did not intend to present Ms. Valdez's identification of Clopten to the jury," and thus that it was the defense that ultimately did so. *Supra* ¶ 40.

¶68 I find this analysis unpersuasive. Melissa Valdez was unquestionably *the prosecution's witness*, and the prosecutor's questions regarding the photo array had only one purpose—to imply that Valdez had identified Clopten. Certainly the defense understood her testimony in that way. And it accordingly went out of its way to do damage control. Its cross-examination of Valdez, however, was aimed at undermining her identification. Clearly the defense had no interest in "seek[ing] to inform the jury that an eyewitness ha[d] recognized the defendant as the perpetrator." *Supra* ¶¶ 35–36. And the prosecution had a clear incentive to do so; it's hard to imagine any other reason for presenting this evidence to the jury.

¶69 I suppose there is a sense in which "it was the defense that made sure the jury knew that Ms. Valdez had identified Mr.

Clopten." *Supra* ¶ 38. But the defense's cross-examination of Valdez was hardly "*intend[ed]* to present Ms. Valdez's identification of Clopten to the jury." *Supra* ¶ 40 (emphasis added). It was aimed at undermining the (implied) identification presented in Valdez's direct–examination. So if the question is which side—prosecution or defense—introduced Valdez's identification to the jury, there can be only one answer. It was clearly the prosecution.

¶70 We create perverse incentives in holding the contrary. Under the majority's rule, a defense lawyer will act at his peril in pursuing the course of undermining an eyewitness for the prosecution. Cross-examination for the purpose of damage control will risk waiver of a due process claim under *Ramirez*.

¶71 I see no reason to put defense lawyers in this quandary. We can avoid the problem by resolving the case on the straightforward ground that the due process standard in *Ramirez* is triggered only by state action in the form of police misconduct. I would so hold, for reasons explained below.

II

¶72 Our cases in this area are not a model of clarity. On one hand, Clopten is right to note that our cases at least arguably suggest that *Ramirez* may extend to cases where police misconduct is absent. Yet the State, for its part, correctly notes that standard due process analysis would require suggestive police activity, and that we have never squarely held the contrary. We should resolve this issue. It is squarely presented and well-briefed. And putting it off will sow the seeds of confusion in our lower courts going forward.

¶73 *Ramirez* involved "blatant [police] suggestiveness" in the course of a police "showup"—a point the court deemed "most critical[] for purposes of this case." *State v. Ramirez*, 817 P.2d 774, 777, 784 (Utah 1991). Yet Clopten is right to note that *Ramirez* did not expressly establish police misconduct as a threshold requirement. And it is true that the *Ramirez* factors have been

applied in some subsequent cases in which suggestive police activity is missing.[3]

¶74 That said, our court has never squarely addressed the question presented in this case under the Due Process Clause of the Utah Constitution. *Ramirez* itself involved suggestive activity by the police, so there was no reason in that case for us to address that question. And in introducing its discussion of reliability, the *Ramirez* court framed the matter as "the analytical model to be used by a trial court in determining the admissibility of *arguably suggestive* eyewitness identifications." *Id.* at 779 (emphasis added). It also emphasized that the factors it identified "depart[ed] from federal case law *only to the degree that [it] f[ou]nd the federal analytical model scientifically unsupported.*" *Id.* at 780 (emphasis added).

¶75 The federal model, moreover, is one that unequivocally requires threshold proof of state action in the form of police misconduct. That was our conclusion in *State v. McCumber*, 622 P.2d 353, 357 (Utah 1980). In *McCumber* we acknowledged that factors undermining an eyewitness identification's reliability "may weaken the probative impact of the evidence offered," but concluded that such considerations "do not mandate suppression of the evidence in the name of due process *without some showing that the identification procedures were themselves impermissibly suggestive.*" *Id.* (emphasis added). Under that standard, our decision in *McCumber* rejected a due process challenge to an eyewitness identification made pursuant to a photographic display and subsequent lineup performed by the police because it found that neither was "impermissibly suggestive." *Id.*

¶76 The *McCumber* decision appears to be based on the Due Process Clause of the U.S. Constitution. And in interpreting the Utah Constitution, we are by no means bound to follow federal caselaw. Our prerogative of *interpreting* the state constitution is not a license to make policy, however; it is a charge to *interpret*. Clopten, moreover, has proffered no basis for reading the words of the Due Process Clause of the Utah Constitution in a manner

---

[3] *State v. Decorso*, 1999 UT 57, ¶ 47, 993 P.2d 837; *State v. Hubbard*, 2002 UT 45, ¶ 25, 48 P.3d 202; *State v. Hollen*, 2002 UT 35, ¶ 64, 44 P.3d 794; *State v. Willett*, 909 P.2d 218, 224 (Utah 1995).

inconsistent with the traditional understanding of "due process" (which requires proof of suggestive police activity). And absent such a basis, I would construe the Utah Due Process Clause to be in line with its federal counterpart.

¶77    Historically, the guarantee of due process has been understood as a bar on state action that deprives a protected party of "life, liberty, or property, without due process of law."[4] This is not a sweeping charter for judges to assure fairness by excluding evidence that may be of questionable reliability in light of emerging principles of social science. It is as a limitation on government action depriving a person of the traditional components of "due process," such as the right to reasonable notice and a meaningful opportunity to be heard.[5]

¶78    I see no basis for extending this longstanding view of due process to establish an omnibus guarantee of evidentiary reliability. Nor do I see a limiting principle on such a slippery slope.

¶79    Our law has never required trial judges to make independent assessments of evidentiary reliability based on an informed understanding of social science. Instead we require judges simply to follow the law of evidence, and to rule on counsel's objections thereunder. A judge is accordingly a state actor to the extent he is performing the duties our law expects of him. But it makes no sense to charge the judge, as Clopten suggests, with a *due process obligation* to foreclose the admission of evidence that is perfectly admissible under the law as it currently

---

[4] UTAH CONST. art. I, § 7. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on *governmental* decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." (emphasis added)).

[5] *See Perry v. New Hampshire*, 132 S. Ct. 716, 720–21 (2012) (holding that due process concerns, absent "the presence of [suggestive] state action" relating to an eyewitness identification, are met by the traditional guarantees of a "fair trial" embedded in the Sixth Amendment, such as "the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution").

stands. That is not the judge's job under longstanding rules of evidence, and it cannot therefore be his job as a matter of due process.

¶80 Any concerns about our current law, moreover, can and should be dealt with by an amendment to our rules of evidence. We would lose the many virtues of that system—and thwart the reliance interests of parties and lower courts—if we required judges to make rules of evidence on the fly based on evolving social science.

¶81 In any event, established caselaw forecloses the conclusion that the admission of unreliable evidence is state action infringing a defendant's right to due process. Unreliability is not the touchstone of a due process challenge to the admission of evidence. State action is. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (upholding admission of privately coerced confession against due process attack given the lack of state action); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (concluding that only the *knowing* presentation of perjured testimony implicates due process).

¶82 This principle dooms Clopten's position. If we are to remain consistent to the historical understanding of due process, we cannot hold that it guarantees a defendant that only reliable evidence will be admitted against him. Coerced confessions and perjured testimony are undoubtedly unreliable. Yet they do not implicate due process unless they are actively, knowingly proffered by the State. *See Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."); *Mooney*, 294 U.S. at 113 (requiring knowing presentation of perjured testimony; emphasizing that due process governs only the "action of a state").

¶83 I would apply this principle here. I would hold that the Utah Constitution's Due Process Clause is not a guarantee of evidentiary reliability but a bar to state action in knowingly presenting unreliable evidence. And I would reject Clopten's challenge to Melissa Valdez's testimony on that basis.