STATE of Utah, Plaintiff and Appellee,

v.

Duane M. WILLETT, Defendant
and Appellant.

No. 940156.

Supreme Court of Utah.

Sept. 12, 1995.

Rehearing Denied Dec. 27, 1995.

crimination, thereby violating Willett's right to call witnesses in his own behalf and to cross-examine witnesses. Willett raises other claims which we address only briefly as we find them to be without merit. His additional claims consist of the following: (1) The trial court improperly admitted an eyewitness identification of defendant, expert testimony concerning wire cutters, and testimony of Dan Boehmer; (2) Willett was denied his right to a speedy trial; (3) Willett's conviction should be reversed due to cumulative error; and (4) the Utah capital homicide statute is unconstitutional as applied to the facts of this case. We affirm.

The victim, Dan Allen Okelberry, was employed as a night manager for Storehouse Market, located in Provo, Utah. Okelberry's duties as night manager included depositing the store's receipts. At about 11:05 p.m. on November 20, 1982, Okelberry locked up and left the Storehouse Market with two other employees, Kenneth Birch and Jess Stoddard. Okelberry was carrying deposit bags containing the store's receipts, approximately $8,000 in cash and $12,200 in checks, to his car to make the nightly deposit run. Okelberry proceeded alone to his car in the parking lot. Shortly thereafter, Birch and Stoddard heard a sound resembling a backfire from a car. After waiting a few minutes for Okelberry to meet them as planned, Stoddard and Birch went to the parking lot, where they found Okelberry lying on the pavement. The money bags were gone and have never been recovered. Neither Birch nor Stoddard saw any car exit from the parking lot while they were waiting.

Dr. Todd Grey, chief medical examiner for the state of Utah, testified at trial that Okelberry died of a small caliber gunshot wound to the back of his head. The fragments removed from Okelberry's brain were determined to be those of a five-millimeter Remington magnum bullet fired from a five-millimeter Remington magnum firearm, either a model 591 or a model 592. A 592 five-millimeter Remington magnum rifle with two rounds of live ammunition in the magazine and one expended cartridge in the chamber was found near the fence by the Storehouse Market. An expert for the State testified

Jan Graham, Atty. Gen. and Kenneth A. Bronston, Asst. Atty. Gen., Salt Lake City, for plaintiff.

Steven B. Killpack, Provo, for defendant.

DURHAM, Justice:

Defendant Duane Willett appeals his conviction for capital homicide, a violation of Utah Code Ann. § 76-5-202. Willett raises the following claims of error: (1) His state constitutional right to confront and cross-examine witnesses at the preliminary hearing was violated because only a ten-year-old partial transcript of the preliminary hearing was available for his review prior to trial; (2) his request to take certain pretrial depositions was improperly refused; and (3) his son, Harley Willett ("Harley"), was improperly allowed to assert his right against self-in-

that the rifle was a fairly rare weapon and that in his twenty years of firearms investigation, he had come in contact with such a weapon only twice.

Daniel Boehmer, who allegedly played chess with Willett while both were in the Provo City Jail in the spring of 1983, testified that Willett described in detail his preparation and plans for the Storehouse Market robbery. Those plans included casing the premises, watching to determine the volume of business, and identifying the store's courier and the egress routes. Willett also allegedly told Boehmer that he, not his son Harley, had done the planning, although Harley did participate in the robbery. Boehmer also testified that Willett said he shot Okelberry or that he directed Harley to shoot Okelberry and that Willett pointed to the back of his head to indicate where Okelberry had been shot. Willett also allegedly told Boehmer that he had used a small caliber rifle, which he then hid in an adjacent lot.

Provo City police officer Michael Mock testified that in August of 1982 he observed Willett, Harley, and William Shillington standing behind a telephone pole as if to conceal themselves as Mock was driving past the Storehouse Market. The men pointed to patrol cars as they drove by. After about ten minutes, the men crossed the street. Two men entered the store, while the third waited in a blue station wagon. Within five minutes, the two men returned and got into the station wagon. Officer Mock followed the men and pulled over the car. The occupants identified themselves as Willett, Harley, and Shillington. Officer Mock's partner, Officer Johnson, searched the car and found three bulletproof vests.

Shillington, who was granted immunity by the Utah County Attorney, testified that he first met Willett and Harley in April 1981. During the summer of 1982, Shillington traveled with them from Alaska to Utah and then to New York, arriving there in September 1982, and then they parted company. Throughout the trip, Willett discussed proposed armed robberies in which he would act as the armed lookout, prepared to take any witnesses "out of the equation" and abandon any firearm as soon as possible, preferably within a block. Group funds were used to purchase body armor, and the group traveled with a very comprehensive first aid kit for the treatment of gunshot wounds. Shillington further testified that the three men reconnoitered the Storehouse Market and the surrounding area and located the motorcycle courier whom they planned to rob. The three men then drove to the Sears & Roebuck parking lot, where Officer Mock pulled them over. Shillington testified that at the time, the men had two handguns and a nine millimeter uzi submachine gun in their other car. Willett planned to overcome the courier by showing him the uzi.

At trial, Storehouse Market employee Jess Stoddard identified Willett as the man he saw for a few seconds in the store on the afternoon of November 20, 1982. Although Stoddard was not sure of the exact time when he saw Willett, it occurred at some point during Stoddard's shift, which began at 1:00 p.m. Stoddard testified that he had noticed Willett because while "everybody else was shopping, trying to get things together for the holiday weekend," Willett was just standing behind the check stands, not doing anything but looking toward the checkers.

Shillington testified that after the three men separated in New York, he did not see Willett or Harley again but received telephone calls from both of them. Willett told Shillington that they needed to get their stories straight because Willett and Harley were getting heat about a murder. Shillington expressed concern to Harley that the police were asking him if the Willetts owned a .22 caliber gun. Harley told Shillington not to worry because "it" was an old five millimeter gun, not a .22.

Jack Prickett, a driver for a wrecker service, testified that on November 21, 1982, at approximately 7:30 to 8:00 a.m. (about nine hours after the murder), he picked up a man who had rolled his van between Mountain Home and Boise. Although Prickett could not identify the individual, he did identify the van belonging to Willett, and Willett stipulated that he was the individual Prickett met. Willett introduced Prickett to his son, paid Prickett with a hundred dollar bill taken from an eighth-inch thick layer of bills, and

told Prickett that he had been to Jackpot and was en route to Oregon.

Prickett also testified that because the roads were icy and slick that morning and the van's tires were bald, he would not have considered it safe to drive at more than forty or forty-five miles per hour. Officer Paul Markling testified that he calculated the driving time between Provo and Jackpot traveling at sixty to sixty-five miles per hour to be five hours and fifteen minutes. When Officer Markling searched Willett's house, he found meal vouchers and hotel receipts, but none were from Jackpot around November 20, 1982.

Provo police executed a search warrant for Willett's home in Oregon, where they seized a nine millimeter uzi submachine gun, a bulletproof vest, a Respond First Aid Kit, and a pair of wire cutters. FBI special agent William Albrecht, an expert in tool marks and firearms, testified that the cut marks on certain wire samples taken from a cut fence adjacent to the crime scene matched the wire cutters seized from Willett's residence.

In January 1983, the State charged Willett and Harley with capital homicide and aggravated robbery. Willett pleaded guilty to an amended information charging only capital homicide, and Harley pleaded guilty to second degree murder. Willett was sentenced to life imprisonment.

In 1990, Willett's motion to withdraw his guilty plea was denied, and his petition for a writ of habeas corpus was dismissed by the Fourth District Court. On appeal, this court found that Willett's plea had been improperly taken and reversed and remanded the case to the district court. *Willett v. Barnes*, 842 P.2d 860, 863 (Utah 1992).

Willett was arraigned on the murder and robbery charges set out in the original information. A jury trial was held in February 1994. Prior to trial, Willett filed an amended notice of alibi, stating that both he and Harley would testify that at about 11:00 p.m. on November 20, 1982, Willett was in Jackpot, Nevada. In Willett's opening statement at trial, counsel told the jury that Harley would

testify his father was not involved in the crime.

At trial, the State called Harley as a witness and had him testify that he had pleaded guilty to the amended information charging that he aided Willett in the commission of the crime. The prosecutor also referred to the factual basis supporting the guilty plea, that Harley "aided and abetted his father." On cross-examination, Harley acknowledged that he had only a tenth grade education and did not understand the terms "aiding" or "abetting." Harley also testified that Willett did not participate in the crime. The trial court then advised Harley that he could invoke the Fifth Amendment right against self-incrimination on the basis that the State might try to file a motion to set aside his guilty plea and charge him with capital murder. The court then sustained objections based upon Harley's invocation of the Fifth Amendment.

Following the jury trial, Willett was convicted of both capital homicide and aggravated robbery. The trial court sentenced him to life imprisonment for the capital homicide conviction only because, following conviction, the aggravated robbery merged with the capital homicide. Willett now appeals his conviction to this court.

■ Willett's first contention involves the preliminary hearing which, in this case, was held on March 8 and 10, 1983, nearly eleven years prior to his trial. The transcript of the second day of the hearing is missing. Willett contends that the passage of time and the incomplete transcript, as well as changes in the prosecution's case, entitled him to a new preliminary hearing or, in the alternative, the right to depose the witnesses whose testimony was not transcribed or who did not testify at the preliminary hearing.

Willett claims that the trial court erred in failing to quash the bindover because the ten-year-old partial transcript did not present an accurate portrayal of the expected testimony of those witnesses who originally testified and because the unavailability of the transcript from the second day deprived him of his right to confront and cross-examine witnesses.[1] Willett, however, has failed to cite

---

1. Willett does not argue that the trial court should have quashed the bindover for insufficient

to the record to support his argument.[2] This court has held that an appellant's failure to cite to the record in his brief is grounds for assuming regularity in the proceedings and correctness in the judgment appealed from. *See, e.g., State v. Olmos,* 712 P.2d 287, 287 (Utah 1986).

Willett's alternative contention is likewise without merit. He argues that the trial court erred in failing to allow the defense to take the depositions of prospective witnesses whose testimony had not been transcribed at the preliminary hearing or whose memory was critical to their testimony.

To support his claims, Willett relies heavily on *State v. Anderson,* 612 P.2d 778 (Utah 1980), in which we discussed the ancillary functions of the preliminary hearing. *Id.* at 784–86. In *Anderson,* we recognized that the preliminary hearing provides an important step in a defendant's preparation of a defense for the subsequent trial in that it "provides a discovery device in which the defendant is not only informed of the nature of the State's case against him, but is provided a means by which he can discover and preserve favorable evidence." *Id.* at 784 (citations omitted). For example, we recognized that cross-examination of witnesses at the preliminary hearing may provide the ancillary benefit of eliciting favorable testimony from the witnesses as well as contradictory statements which may subsequently be used to attack the witnesses' credibility at the actual trial. *Id.* at 786.

■ Although the preliminary examination constitutes a significant step in the criminal process, *Anderson* should not be interpreted as an open door to discovery. There is no legal support for Willett's proposition that he is entitled to depose witnesses who did not testify at the preliminary hearing. In general, a trial court is allowed broad discretion in granting or denying discovery;

"its determinations on this subject will not be overturned on appeal unless the court has abused its discretion." *State v. Knill,* 656 P.2d 1026, 1027 (Utah 1982).

In this case, the trial court's discretion regarding discovery was properly exercised. Prior to trial, Willett filed a discovery motion requesting that he be allowed to take the depositions of any of the thirty-six prosecution witnesses listed for trial whose testimony the defense considered critical. Following a hearing on Willett's discovery motion, the trial court ruled that it intended to allow depositions only where there was no record of the substance of the witnesses' testimony, such as a police report. Accordingly, the trial court allowed Willett to depose Wayne Watson, Brent Bullock, and Noall Wootton, because it appeared that there was no record of their testimony under oath. In addition, the trial court ordered the prosecutor to provide Willett with summaries of the anticipated testimony of Frank Leahy, Laurie Casperson, and George Pierpont, none of whom were examined at the preliminary hearing.

■ Willett cites rule 16 of the Utah Rules of Criminal Procedure to support his argument that he was entitled to depose witnesses whose testimony had not been transcribed at the preliminary hearing or whose memory was central to their testimony. However, we have held, "Rule 14(h) of the Utah Rules of Criminal Procedure exclusively governs the taking of depositions in criminal cases." *Parsons v. Barnes,* 871 P.2d 516, 519 (Utah 1994) (citations omitted). Rule 14(h) permits depositions only in certain circumstances:

(h) Whenever a material witness is about to leave the state, or is so ill or infirm as to afford reasonable grounds for believing that he will be unable to attend a trial or hearing, either party may, upon notice to the other, apply to the court for

---

evidence. Thus, the issue of sufficiency is not before the court.

**2.** Willett has failed to direct us to any deficiencies in the existing portion of the preliminary transcript and has failed to show any significant discrepancies in the testimony of witnesses who testified at both the preliminary hearing and the trial. As to those witnesses who testified on the

second day of the preliminary hearing and whose testimony is therefore not transcribed, the minute entries for the preliminary hearing indicate that no witnesses testified for the State on the second day. According to the minute entry for March 10, the only two witnesses to testify on the second day were called by the defense.

an order that the witness be examined conditionally by deposition.

*Id.* at 519–20. Willett has failed to show us how his circumstances fall within the requirements of rule 14(h). Nor has he shown how he was prejudiced by the trial court's refusal to allow him to take witness depositions generally. Willett was informed as to the substance of witnesses' testimony prior to trial and was afforded an adequate opportunity to prepare his defense. Accordingly, we reject his argument.

We next address Willett's contention that Harley was improperly allowed to assert his right against self-incrimination, thereby violating Willett's right to call witnesses in his own behalf and to cross-examine them. Willett argues that because Harley had already been sentenced for aiding in Okelberry's murder, he no longer had a reasonable fear of being prosecuted for making statements regarding his role in the murder.

In response to Willett's contentions, the State argues that Harley was justified in invoking his right against self-incrimination because the prosecutor might have moved to set aside Harley's plea on the basis of false testimony and to file charges against him for a capital offense. The State further argues that Harley's expected testimony could have subjected Harley to perjury charges.

We are gravely concerned with the State's assertions. At the time of Willett's trial, Harley's plea had been accepted and he had been sentenced for the homicide at issue in this case. We therefore find it difficult to see how Harley could contend that he had a real and demonstrable fear of future prosecution for the same offense. *See Affleck v. Third Judicial Dist. Court,* 655 P.2d 665, 667 (Utah 1982). Although the State concedes that the privilege against self-incrimination ends when a witness pleads guilty and is sentenced, it asserts that this rule applies only to the crime for which conviction was obtained. *See State v. Parham,* 220 N.W.2d 623, 627 (Iowa 1974) (holding that if testimony could incriminate the witness for other crimes, he may properly assert the privilege).

Yet the State fails to identify what additional crime apart from perjury Harley might reasonably be charged with in a future prosecution. The State refers only to capital murder, which in this case would be precluded by the prior conviction for the lesser included offense of first degree murder.

■ As to the risk of prosecution for perjury, we are likewise skeptical. A witness may not invoke the privilege against self-incrimination to prevent himself from imminent commission of perjury. Although the reverse is possible, i.e., a witness may claim the privilege to prevent himself from revealing a previous perjury, *see, e.g., United States v. Partin,* 552 F.2d 621, 632 (5th Cir.1977) (recognizing that a witness "may claim the privilege if his new testimony might suggest that he had perjured himself in testifying on the same subject at a prior proceeding"), the State fails to detail such circumstances in this case. The only incident of perjury which we can infer from the record and which would have occurred prior to Harley's testimony at trial, would have involved Harley's plea statement. However, even if Harley perjured himself in making his plea statement, he had waived any privilege as to this issue by the time he invoked his right during cross-examination at Willett's trial. Before invoking his right, he had already testified that Willett was not involved in the crime. Because this testimony is apparently inconsistent with assertions Harley made at his plea hearing (i.e., that he aided and abetted Willett in the commission of the crime),[3] by so testifying Harley waived his right to invoke the privilege as to this issue. *See First Fed. Sav. & Loan Ass'n v. Schamanek,* 684 P.2d 1257, 1262 (Utah 1984). Furthermore, because Willett's due process rights to cross-examine witnesses and to call witnesses on his own behalf are at stake, we are not inclined to construe Harley's self-incrimination privilege expansively. *See In re Cueto,* 554 F.2d 14, 15 (2d Cir.1977).

*Barnes,* 842 P.2d 860, 861–62 (Utah 1992).

**3.** The factual basis for Harley's plea was scant, as is recognized by our opinion in *Willett v.*

■ Notwithstanding our concerns regarding the legitimacy of Harley's invocation of the privilege, we find that any error on this issue was harmless given the other evidence of Willett's guilt. Competent police and lay testimony showed that Willett was "casing" the robbery premises and the bank depository before the murder. One of his former cohorts, William Shillington, whose testimony is credible in light of its remarkable consistency with the testimony of police officer Mock, described in detail how the victim was identified and located. Officer Mock and Shillington both testified that while Willett was reconnoitering the Storehouse Market, Willett had a bulletproof vest. Shillington testified that at this same time, Willett also had an uzi submachine gun. These items were later found in Willett's home. A Storehouse Market employee testified that he saw Willett in the store on the afternoon of the murder, just watching the checkers. A "fairly rare" type of rifle, linked to Willett through Shillington's testimony and of the same caliber as the bullet that killed the victim, was found near the murder scene. An FBI expert determined that wire cutters found in Willett's residence were the same cutters used to cut the fence at the murder scene. Within hours of the robbery and murder, Willett paid a wrecker with a $100 bill from an eighth-inch thick wad of bills. Willett's version of events (which he says Harley's testimony would have corroborated) was that although he may have been in the Storehouse Market on the afternoon of November 20, Harley then drove him to Jackpot, Nevada, returned alone to Provo to commit the crime, and then returned to Jackpot to pick up Willett and continue to Idaho, where the van rolled. This account is extremely unlikely due to Officer Markling's testimony regarding his logging of the driving times as well as Jack Prickett's testimony regarding the condition of Willett's van, which demonstrated that it would have taken Harley well over ten hours to drive the round trip from Provo to Jackpot. On the basis of the foregoing compelling evidence of Willett's guilt, we conclude that any error in Harley's invocation of the self-incrimination privilege was harmless. We further note that because Harley's testimony on cross-examination supported the substance of Willett's defense, namely, that Willett was not involved in the crime, Willett was not unduly prejudiced in not being allowed to extend cross-examination.[4]

■ We now briefly address the remainder of Willett's claims. He contends that the court improperly admitted the eyewitness testimony of Jess Stoddard because (1) the testimony was unreliable under the criteria set out in *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991); and (2) the two photo arrays initially shown Stoddard were lost before Willett had an opportunity to examine them. We find that under the *Ramirez* criteria, Stoddard's identification of Willett was sufficiently reliable to be admitted into evidence. As to the photo arrays, Willett has failed to show that they were constitutionally material to his case. *See State v. Nebeker*, 657 P.2d 1359, 1363 (Utah 1983) (holding that " '[t]he mere possibility that an item of undisclosed evidence might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' " (citations omitted) (quoting *State v. Hudspeth*, 22 Wash.App. 292, 593 P.2d 548, 550 (1978))).

Willett also asserts that the testimony of Daniel Boehmer should have been excluded, principally because the State did not timely identify Boehmer as a witness. We disagree. Because the prosecutor did not breach his discovery duties and because Willett had adequate time to prepare for Boehmer's testimony prior to trial, we find that the trial court did not abuse its discretion in allowing Boehmer to testify.

■ Willett further submits that the trial court erred in allowing expert testimony concerning the wire cutters due to insufficient authentication of the wire strands and the cutters. We find, however, that an adequate

---

4. Although Harley invoked the privilege to avoid testifying as to the specifics of Willett's alibi, Willett's deprivation of this testimony is harmless, as set out in our discussion above. Willett's alibi was discredited by evidence making it extremely unlikely that he was in Jackpot, Nevada, at the time of the crime.

chain of custody for both the strands and the cutters was established by testimony from Officer Pierpont and FBI special agent William Albrecht, as well as reports from Officer Grossgebauer, who was deceased by the time of trial. On the basis of this evidence and because there is no showing of tampering with the challenged evidence, we reject Willett's argument.

■ Willett also contends that he was denied his right to a speedy trial because there were a total of 345 days between his withdrawal of his guilty plea and his trial. We have applied the balancing factors set out in *State v. Trafny*, 799 P.2d 704, 706 (Utah 1990), and conclude that Willett was not denied his right to a speedy trial. The length of the delay was not disproportionate to the complexity of the case, and although Willett frequently asserted his right to be speedily tried, he continually caused delays by requesting continuances for discovery and to file motions. In addition, he failed to show that he was prejudiced by any delay. Accordingly, we find his contention to be without merit.

■ Pursuant to our review of the record and as set out in our discussion of harmless error above, we likewise reject Willett's claim that his conviction should be reversed due to cumulative error. Finally, his claim that the Utah capital homicide statute is unconstitutional as applied to the facts of this case is theoretically unsound and was essentially rejected in *State v. Tillman*, 750 P.2d 546 (Utah 1987), and *State v. Young*, 853 P.2d 327 (Utah 1993). *See Young*, 853 P.2d at 336–38 (plurality opinion); *Tillman*, 750 P.2d at 568–69 (Hall, C.J., lead opinion); *id.* at 581 (Stewart, Assoc. C.J., concurring); *id.* at 589–90 (Durham, J., concurring).

Willett's conviction is affirmed.

ZIMMERMAN, C.J., STEWART, Associate C.J., and HOWE and RUSSON, JJ., concur.